**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

KEVIN M. MCCANN, M.D.,

    Plaintiff,

    v.

UNUM PROVIDENT, et al.,

    Defendants.

CIVIL ACTION NO. 11-3241 (MLC)

**MEMORANDUM OPINION**

**COOPER, District Judge**

## I.    INTRODUCTION

The plaintiff, Kevin M. McCann, M.D., commenced this action pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA") against, among others, the defendant Hartford Life and Accident Insurance Company ("Hartford"). (Dkt. entry no. 1, Compl., Count II.)[1] The matter now comes before the Court on cross motions for summary judgment by McCann and Hartford, each concerning the termination of McCann's benefit payments under a Hartford-issued long-term disability ("LTD") insurance policy. (Dkt. entry no. 42, Hartford Mot.; dkt. entry no. 43, McCann Mot.) The Court is tasked with determining whether Hartford acted in an arbitrary and capricious manner by terminating McCann's LTD benefit payments.

---

[1] McCann also raised a claim against the defendant Unum Provident. See generally McCann v. Unum Provident, No. 11-3241, 2013 WL 396182 (D.N.J. Jan. 31, 2013).

The Court has considered the motions on the papers and without oral argument.  See L.Civ.R. 78.1(b).  For the reasons that follow, the Court has determined that Hartford's decision to terminate McCann's LTD benefit payments was neither arbitrary nor capricious.

## II.  FINDINGS OF FACT[2]

### A.   The Plan & The Policy

McCann, a radiologist certified in the sub-specialty of interventional radiology, began working for Holzer Clinic ("Holzer") in Gallipolis, Ohio in February of 2005.  As a Holzer employee, McCann participated in the Group Long Term Disability Plan for Employees of Holzer Clinic, Inc. ("the Plan").  The Plan provided LTD insurance coverage to eligible employees pursuant to the terms of Hartford-issued Group Policy Number GVL-16009 ("the Policy"), which is governed by ERISA.

The Policy provides that Hartford will "pay You a Monthly Benefit if You: 1) become Disabled while insured under The Policy; 2) are Disabled through the Elimination Period; 3) are Disabled beyond the Elimination Period; and 4) submit Proof of Loss to"

---

[2] The facts recited here are, unless otherwise indicated, undisputed.  (Compare dkt. entry no. 42-4, Hartford Statement of Material Facts Not in Dispute ("Hartford SOF"), with dkt. entry no. 44-1, McCann Response to Hartford SOF; compare dkt. entry no. dkt. entry no. 43-2, McCann Statement of Material Facts ("McCann SOF"), with dkt. entry no. 46, Hartford Response to McCann SOF.)  The Court thus cites the record only where the Court quotes directly from either the parties' submissions or the administrative record.

The administrative record appears in sequentially paginated portions of the docket at entry numbers 22-2 through 22-12.

2

Hartford.  (Administrative Record ("A.R.") at 866.)[3]  It also

provides that Hartford will terminate an insured's monthly benefit

payments upon the earliest of several triggering events, including,

among others, "the date You are no longer Disabled."  (Id. at 868.)

The Policy jointly defines the terms "Disabled" and

"Disability".  (See id. at 875-76.)  Pursuant to the Policy, an

insured is Disabled or suffers from a Disability if "You are

prevented from performing one or more of the Essential Duties of

. . . Your Occupation" both during and following the Elimination

Period.  (Id. at 876.)  The Policy defines "Occupation"

> as it is recognized in the general workplace, that You
> were routinely performing prior to becoming Disabled.
> Your Occupation does not mean the specific job that You
> were performing for a specific employer or at a specific
> location.
>
> If You are a Physician, Your Occupation means the
> general or sub-specialty in which You are practicing for
> which there is a specialty or sub-specialty recognized
> by the American Board of Medical Specialties.  If the
> sub-specialty is not recognized by the American Board of
> Medical Specialties, You will be considered practicing
> in the general specialty category.

(Id. at 879.)  The Policy defines an "Essential Duty" as "a duty

that: 1) is substantial, not incidental; 2) is fundamental or

inherent to the occupation; and 3) cannot be reasonably omitted or

---

[3] Under the Policy, the terms "You" and "Your" refer to the
policyholder.  (See A.R. at 879 (bold typeface omitted).)  Further,
it appears that the Elimination Period is the ninety-day period
following the onset of Disability.  (See id. at 862.)

3

changed.  Your ability to work the number of hours in Your regularly scheduled work week is an Essential Duty."  (Id. at 876.)

The Policy also grants Hartford "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of The Policy."  (Id. at 875.)

## B.   McCann's Pre-Application Treatment History

McCann, in April of 2007, was diagnosed with a mildly dilated ascending aortic root, i.e., an aortic aneurysm.[4]  A CT scan of McCann's chest was taken on January 9, 2008, and on January 30, 2008, McCann met and consulted with Dr. Joseph Coselli.  Coselli was a board-certified cardiothoracic surgeon who served as both a professor at the Baylor College of Medicine and the Chief of Adult Cardiac Surgery at the Texas Heart Institute in Houston, Texas.

Coselli reviewed the CT scan films, which demonstrated that the aneurysm "measur[ed] 4 cm in diameter."  (Id. at 670.)  He interviewed McCann, and noted that McCann was not in pain, but complained of a sleep disorder and presented with hypertension; his sitting blood pressure was 152/98.  He also noted that McCann had a history of hypertension, a risk factor for aortic aneurysm.

---

[4] An aortic aneurysm consists of an abnormal enlargement of a weakened area of the aorta.  Such aneurysms "are prone to rupture once they reach a certain size.  Should a thoracic aortic aneurysm rupture prior to surgical intervention, resulting in internal bleeding, there is a significant chance the individual will die before even receiving medical treatment."  (McCann SOF at ¶ 2; accord Hartford Response to McCann SOF at ¶ 2.)

4

Coselli and McCann discussed the size and position of the aortic aneurysm.  Coselli then, among other things, recommended that McCann: (1) better manage his blood pressure, with a goal of maintaining it between 110/70 and 120/70; (2) exercise "to stay fit and . . . to drop some weight"; (3) avoid acts that might elicit the Valsalva maneuver;[5] and (4) improve his overall coronary health by losing weight and taking Lipitor, a drug related to cholesterol.  (Id. at 671.)  Coselli also noted his impression that there was a "30% chance" that McCann's aneurysm would grow to five centimeters, and thus require surgical intervention, within ten years.  (Id.)

## C.   McCann's Application for LTD Benefit Payments

McCann applied to Hartford for LTD benefit payments on or about March 14, 2008, claiming an inability to work that manifested on March 10, 2008.  His application ("the Application") consisted of Hartford-issued forms that he, a Holzer representative, and Coselli completed.  (See id. at 785-94.)

Both the Holzer representative and McCann reported in the Application that McCann served Holzer as a "Radiologist."  (See id. at 785 (noting that McCann's "permanent job on his . . . last day

---

[5] "The Valsalva maneuver is a 'maneuver in which a person tries to exhale forcibly with a closed glottis (the windpipe) so that no air exits through the mouth or nose as, for example, in strenuous coughing, straining during a bowel movement, or lifting a heavy weight.  The Valsalva maneuver impedes the return of venous blood to the heart." (Hartford SOF at ¶ 11 (citation omitted); accord McCann Response to Hartford SOF at ¶ 11.)

of work" was "Physician – Radiology"), 787 (providing McCann's "job title" as "Radiologist").)  McCann stated that his duties as a Radiologist concerned both diagnostic and interventional radiology. (See id. at 787.)

Coselli, in an "Attending Physician Statement", provided both primary and secondary diagnoses; he stated that McCann suffered primarily from a "Mildly dilated Ascending Aortic Root" and secondarily from hypertension and obesity.  He noted that McCann was, upon physical examination, "asymptomatic . . . with normal exam."  (Id. at 793.)  He also stated that the suggested treatment for McCann's condition involved "monitoring [the] aorta, aggressive BP control, weight loss and exercise, [and] avoid[ing] stress." (Id.)

Coselli noted that McCann's condition would not limit his activities, insofar as those activities involved sitting, standing, walking, driving, using a keyboard, or otherwise engaging in repetitive hand motions.  And McCann noted in the Application that he could, despite his condition, independently bathe, dress, use a toilet, move from a bed to a chair, maintain a reasonable level of personal hygiene, and feed himself.  But Coselli suggested that McCann should refrain from any physical act that might elicit the Valsalva maneuver.  He also suggested that McCann should avoid stress, to avoid increasing his blood pressure.

6

Hartford, after reviewing the Application, requested additional information from Coselli, concerning the nature of and limitations resulting from McCann's alleged disability.  Coselli timely responded.  He noted that McCann's aneurysm constituted a progressive condition and that McCann, "[b]ecause of his obesity status, sleep apnea, male gender, and chronic hypertension . . . is at increased risk for aneurysm progression." (Id. at 652.)  He also stated that McCann "has [a] low stress tolerance[,] and the pressure of his job raises his blood pressure beyond what we would recommend to prevent his aneurysm growth."  (Id.)[6]

Hartford, by letter dated June 27, 2008, informed McCann that the Application had been conditionally approved.[7]

---

[6] Coselli authored a related letter on April 3, 2008, addressed to Dr. Wayne Munro of Holzer.  In that letter, Coselli described McCann's aneurysm, and noted that: (1) McCann had hypertension and sleep apnea; (2) both the hypertension and sleep apnea placed McCann "into a high risk population for risk of further dilation of his aorta"; (3) Coselli had recommended that McCann, "to improve his overall functional capacity," "maintain tight blood pressure control," lose weight, and exercise; and (4) Coselli had instructed McCann "to have follow-up CTA's [sic] every 6 months to monitor his aorta, and [to] avoid stressful situations that could cause increases in his blood pressure."  (A.R. at 649.) Coselli also expressed his opinion that "it would be best if [McCann were] classified as fully disabled permanently, effective March 10, 2008." (Id.)

[7] The condition was removed shortly thereafter and, in any case, does not bear on the Court's resolution of the motions.

**D.   McCann's Medical Records, Post-Application**

It appears that Hartford, pursuant to the Policy, continued to monitor McCann's health after approving the Application.[8]  To that end, McCann submitted to another CT scan on September 29, 2008. The resulting report stated that "[t]here [was] minimal dilatation of the ascending aorta with widest AP diameter of around 4.5 cm, which is noted and unchanged since 1/9/08."  (Id. at 587.) Coselli, after reviewing that report, wrote that he was "pleased to see that there appears to be no significant change from the previous study."  (Id. at 588 (emphasis added).)

McCann was treated by his primary care physician, Dr. Nabil Fahmy, on September 30, 2008.  McCann expressed concern at that visit about the aneurysm but generally appeared asymptomatic. Fahmy noted that McCann "[was] doing well, BP is under less than ideal control at home, no chest pain or abdominal pain, no muscle cramps, no swelling of the lower extremities, no acute focal neuro-changes, no headache."  (Id. at 584.)  She also noted that McCann had questions about a machine used to control his sleep apnea, a continuous positive airway pressure ("CPAP") unit.

---

[8] The Policy requires an insured to remain Disabled to remain eligible for LTD benefit payments.  (See A.R. at 866, 868.) Accordingly, the Policy thus gives Hartford the right to require additional proofs of loss, including examinations by physicians, vocational experts, and functional experts.  (See id. at 872.)

Fahmy discussed diet and exercise with McCann, and advised him to moderate salt intake.  She modified a prescription relating to his blood pressure, and noted as much in his chart.  But she did not suggest or otherwise comment on any functional limitations relating to his condition.

Approximately six months lapsed before the creation of the next noteworthy record.  On April 1, 2009, McCann completed a Hartford-issued claimant questionnaire concerning his condition and functionality.  He noted on that form that he had not experienced a change in condition in the preceding eighteen months, and that he did not require assistance with his daily activities.[9]

It appears that McCann also asked Coselli to complete and submit a new Attending Physician Statement.  (See id. at 32.)  On April 22, 2009, "Jodi", a representative from Coselli's office, called Hartford and notified the insurer that Coselli had received those forms from McCann.  She stated, however, that Coselli was reluctant to complete those forms because Coselli, who only treated McCann once, on January 30, 2008, had no knowledge of McCann's current functional capabilities.  (See id.)

---

[9] McCann specifically reported that he continued to independently bathe, dress, use a toilet, move from a bed to a chair, maintain a reasonable level of personal hygiene, and feed himself.  He also reported that he read, watched television, and walked without assistance.  (See A.R. at 569.)

Coselli, at Hartford's suggestion, completed the Attending
Physician Statement based on his knowledge of McCann's current
condition and functional capabilities, and submitted it to Hartford
on April 23, 2009.  But, as foreshadowed by the comments made by
"Jodi", Coselli lacked knowledge of and did not evaluate McCann's
functional capacity.  He instead reiterated that he had not seen or
treated McCann since January 30, 2008, and suggested that "patient
should be referred for functional testing."  (Id. at 567.)

Hartford, based on Coselli's recommendation, began working to
schedule a two-day functional capacity evaluation ("FCE").  In the
interim, McCann submitted to an echocardiogram and a third CT scan.
The report subsequently generated on August 9, 2009 demonstrated
that the diameter of the aneurysm then measured approximately 4.3
centimeters.

Coselli met and examined McCann, and reviewed that report, on
September 9, 2009.  Later, to recap their meeting, he wrote a
letter to McCann, stating:

> I am pleased to note that your aortic aneurysm has . . .
> only minimal[ly] increase[d] in size . . . from 4.0 cm
> to the current 4.3 cm . . . .
>
> Because of these findings and as previously discussed,
> medical management is the recommended course of
> treatment for you at this time.  That includes:
>
> > - Scheduled monitoring with CT scan and
> > Echocardiogram . . . .  We are happy to review and
> > consult on these reports.

10

> - Hypertension management which includes avoidance
> of extremes of heavy lifting and activity; your
> blood pressure has been high for your past two
> office visits and for the Echo, ranging from 138/91
> to 161/96.  This needs consistently to be around
> 120/70.
> - Medical management of your Obstructive sleep
> apnea.
> - Weight loss in that it has an adverse effect on
> the other three above medical conditions.  Adoption
> of a healthier lifestyle by diet and exercise may
> well make the difference in the need to ever have
> surgical intervention on your aorta.

(Id. at 312.)  Coselli also stated:

> As in the original letters to [Holzer], your disability
> classification remains unchanged.  Our Office, though
> happy to monitor your aortic studies, is not a medical
> practice, but surgical.  We ask that you consult your
> primary care physician to coordinate and manage your
> care on the above four issues and others as becomes
> necessary.

(Id.)

Dr. David Lombardi, McCann's primary care physician, wrote a one-paragraph letter addressing McCann's disability status on December 17, 2009, addressed "[t]o whom it may concern."  (Id. at 313.)  Lombardi stated that he reviewed Coselli's reports and letters, and, based on Coselli's findings, agreed that McCann should be classified as fully and permanently disabled.  He does not state, and it is thus unclear, whether he either examined McCann or reviewed any other medical records, including the independent medical examination discussed in the next section.

11

**E.    The Independent Medical Examination**

Hartford was unable to schedule the FCE, and instead scheduled an independent medical examination ("IME").[10]  The IME was conducted on October 30, 2009, by board-certified cardiologist Dr. Jeffrey Kramer.  Kramer, following the IME, submitted a report to Hartford.

Kramer based the IME report on both his: (1) examination of McCann; and (2) review of the records supplied by Hartford.  Those records included: (1) an echocardiogram from April of 2007, which showed that the diameter of the aneurysm was 3.71 centimeters; (2) the 1-9-08 CT scan report, which showed that the diameter of the aneurysm was as large as 4 centimeters; (3) the 4-3-08 letter written by Coselli, recommending that McCann be considered totally and permanently disabled; and (4) the 9-29-08 CT scan report, which showed that the diameter of the aneurysm was approximately 4.5 centimeters.  (See id. at 483.)  Kramer did not review or consider the 8-9-09 report, which showed that the aneurysm measured 4.3 centimeters.  (See McCann SOF at ¶ 60.  But see Hartford Response to McCann SOF at ¶ 60 ("Undisputed.  [But b]y way of further answer, Dr. Kramer in formulating his opinion was aware that Plaintiff's aneurysm was anywhere from 3.7 to 4.5 centimeters.").)

---

[10] Because the Court need not further reference the FCE to resolve the motions, the facts underlying Hartford's inability to schedule the FCE -- whether undisputed or not -- are immaterial.

Kramer, like Coselli, reported that there had been "no significant change" in the size of the aneurysm since April of 2007.  (Id. at 483.)  He also reported that McCann was asymptomatic, having "never been troubled by chest pain, symptoms of congestive heart failure, palpitations, lightheadedness or syncope."  (Id. at 482.)  Kramer noted that McCann's blood pressure during the 10-30-09 exam was 120/70, and that McCann represented that he maintained the same blood pressure at home.

Kramer ultimately concluded that McCann was not disabled, explaining:

> I do note that Dr. Joseph Coselli has recommended that Dr. McCann be classified as fully and permanently disabled.
> With respect to Dr. Coselli's expertise in this field, I must nevertheless state that I do not see the need to consider Dr. McCann fully and permanently disabled based on his stable mild aneurysmal dilatation of the ascending aorta.  I would certainly agree with Dr. Coselli's recommendations that tight blood pressure control would be warranted, but there are certainly no formal guidelines to support disability in this situation.  I certainly have no reason to believe that functioning as a radiologist would increase the risk of progressive aneurysmal dilatation or clinically important problems.
> In the absence of formal guidelines, a definitive statement cannot be made but I would reiterate that my clinical judgement [sic] would not support the need for disability in this circumstance.

(Id. at 482-83.)

Kramer, following the IME, also completed a Hartford-issued "Physical Capacities Evaluation Form" ("PCE").  (See id. at 482-

83.)  As demonstrated in the PCE, Kramer placed no restrictions on McCann's ability to sit, stand, or walk in a general workplace environment.[11]  He also noted that McCann could constantly (i.e., between 68% and 100% of the time) drive, kneel, crouch, balance, exercise gross motor skills (e.g., gripping, holding, and grasping), exercise fine motor skills (e.g., fingering), and lift objects weighing up to ten pounds.

Hartford forwarded the IME report and PCE to Coselli on December 14, 2009.  Coselli did not respond.

**F.   The Termination of McCann's LTD Benefit Payments**

Hartford, during its ongoing review of McCann's claim and the related medical documentation, determined that McCann did not meet the Policy definition of "Disability" beyond February 4, 2010.  The insurer notified McCann of the decision to terminate his benefit payments in a letter dated February 9, 2010 ("the Termination Letter").  There, Hartford set forth the bases for its conclusion, including, inter alia: (1) Coselli's records from April of 2007 through November of 2008; (2) Fahmy's records; and (3) the IME Report and PCE.

---

[11]  Kramer originally stated that McCann could sit for three hours per day, stand for three hours per day, and walk for two hours per day.  He later amended his report, stating that "[t]here are no restrictions placed, no limitations on activities of any type for sit/stand/walk (i.e., may sit/stand/walk 24°/day)[.]" (A.R. at 487 (emphasis in original).)

Hartford noted the progression of McCann's hypertension, as demonstrated by the IME report.  As recited in the Termination Letter, the IME report showed Kramer's: (1) observation that McCann's blood pressure was 120/70; (2) observation that McCann could maintain that blood pressure at home; (3) conclusion that functioning as a radiologist would not increase McCann's risk of progressive aneurysmal dilatation or clinically important problems; and (4) conclusion that McCann was not Disabled.  (See id. at 474-75.)  Hartford also noted that Kramer completed the PCE, set forth the results of that evaluation, and noted that Coselli had an opportunity but failed to indicate disagreement with either the IME report or the PCE.

Hartford further stated:

> The Dictionary of Occupational Titles classifies the demands of a Radiologist as light.  The Department of Labor defines light work as: Exerting up to 20 pounds of force occasionally, and/or 10 pounds of force frequently, and/or a negligible amount of force constantly (Constantly: activity of condition exists 2/3 or more of the time) to move objects. . . .  Even though the weight lifted may be only a negligible amount, a job should be rated Light Work: (1) when it requires walking or standing to a significant degree; or (2) when it requires sitting most of the time but entails pushing and/or pulling of arm or leg controls; and/or (3) when the job requires working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible. . . .

(Id. at 475.)  Hartford concluded from the medical evidence of record, the functional evaluations of record, and "the demands of a Radiologist", as that term is construed by the Dictionary of Occupational Titles and the Department of Labor, that McCann was able to perform the "Essential Duties of his Occupation as a Radiologist" effective February 5, 2010.

The Termination Letter concluded by notifying McCann of his right to appeal the termination of his LTD benefit payments "and [to] receive a full and fair review."  (Id. at 476.)

**G.   Post-Termination Medical Evaluations**

McCann consulted Dr. Chandra Madala, a board-certified cardiologist, on June 14, 2010.  Madala thereafter wrote a one-page letter, summarizing her findings that McCann's medical history was "significant for an ascending aortic aneurysm, sleep apnea and hypertension."  (Id. at 221.)

Madala expressed concern that the aneurysm increased in size from 4 to 4.3 centimeters "despite avoiding the high stress level and demanding physical requirements associated with working as an interventional radiologist."  (Id.)  But Madala did not recognize that the aneurysm had most recently decreased in size, to 4.3 centimeters.  She also failed to support or otherwise explain her findings that working as an interventional radiologist involved demanding physical requirements and high stress levels.

16

Madala noted that McCann had a history of hypertension, which
"appear[ed] better controlled since becoming disabled in March
2008".  (Id.)  She also noted that McCann suffered from sleep
apnea, and that he reported difficulty sleeping and significant
daytime fatigue.  She opined without explanation that "the
combination of sleep apnea, hypertension and stress place[d McCann]
in a high risk category for premature accelerated enlargement of
the aneurysm", and recommended ongoing blood pressure control and
lifestyle modification.  (Id.)  She noted that it was "[o]f
particular importance to avoid stress."  (Id.)

Madala, near the end of the letter, reported that she
"reviewed and agree[d] with Dr. Coselli's letter to Holzer Clinic
dated September 2008."  (Id.)  She agreed "with his recommendation
that you are fully and permanently disabled."  (Id.)  However, it
appears from the letter that Madala did not review other pertinent
medical records, including the report and evaluation prepared by
Kramer.

Dr. Howard Linder of Holzer also wrote a letter on June 14,
2010, addressing McCann's sleep apnea.  Linder noted that McCann
requested the letter, as "his sleep apnea . . . complicates his
hypertension which is a continuing risk factor for possible
rupturing [of] his aneurysm."  (Id. at 217.)  Linder reported both
that McCann's sleep apnea "was adequately treated with CPAP" and

17

that CPAP treatment represented "our best prescription".  He noted,
however, that "[t]reatment with CPAP . . . helps but does not
eliminate the risk factor of contributing to [McCann's]
hypertension." (Id.)

## H.    The Appeal

McCann timely sent Hartford his appeal from its decision to
terminate his LTD benefit payments on July 26, 2010 ("the Appeal").
The appeal was an administrative proceeding resolved by Hartford.

McCann raised several arguments on appeal.[12]  First, he argued
that Hartford erred by classifying him as a Radiologist rather than
as an Interventional Radiologist, "a recognized sub-specialty
described by the American Board of Medical Specialties and a
distinctly different area of practice from a general radiologist."
(Id. at 173-74.)  Per McCann, the practice of interventional
radiology significantly differs from the practice of general
radiology because interventional radiologists, unlike radiologists,
perform invasive procedures.

To support this argument, McCann submitted documentation from
Dr. Philip Long, the Vice Chairman of the Holzer Department of
Radiology.  Long detailed McCann's typical workweek, averring that
McCann typically spent twenty-eight hours on diagnostic radiology,
twenty hours on interventional radiology, one hour on fluoroscopy,

---

[12] The Court here recites only those arguments deemed
pertinent to the Court's discussion of the history of the action.

18

and one or two hours on reports and paperwork.  Long also averred that McCann typically worked for approximately ten hours on nights and weekends.  Long approximated that McCann, in a typical workday, would stand for between three and five hours, sit for between three and five hours, and walk for between one and three hours.  He also reported that McCann frequently typed, grasped items, and manipulated items, and occasionally bent, reached up, and drove a motor vehicle.

McCann also argued that Hartford failed to properly credit Coselli's prediction that there was a likelihood -- specifically, a thirty percent chance -- that his aneurysm would require surgical interventional within ten years.  He alleged that "[a]lthough it does not expressly appear in [Coselli's] report . . . Dr. Coselli discussed Dr. McCann's occupational stresses as an Interventional Radiologist, and he recommended that continuing as an IR was a serious danger to his health."  (Id. at 178.)

McCann also argued that Hartford improperly credited the IME report.  This argument rested on three bases.  First, he argued that Kramer was not properly credentialed to issue the report because he, unlike Coselli, was not a cardiothoracic surgeon.  Second, he argued that Kramer did not have, request, or review the 8-9-09 CT scan report, which demonstrated that the aneurysm grew from 4 to 4.3 centimeters.  Third, he argued that Kramer was not

aware of the nature of and stresses inherent in his Occupation, i.e., interventional radiology.

## I.   Post-Appeal Medical and Functional Evaluations

Hartford, upon receipt of the appeal, sought independent medical input from Dr. Andrew Filderman and Dr. William Bachman. Filderman was board-certified in pulmonary medicine.  Bachman was a board-certified cardiologist.

Filderman reviewed medical records provided by Hartford, and issued a report focusing on McCann's sleep apnea.  The records that Filderman reviewed were authored or summarized by Linder, who oversaw sleep studies on December 18, 2006, January 25, 2007, and March 2, 2009.  Filderman also reviewed the 6-14-10 letter authored by Linder.  After completing that review, he noted that McCann: (1) was diagnosed with obstructive sleep apnea in 2006; (2) used a CPAP unit to treat his condition; and (3) had the CPAP unit adjusted in 2007 and 2009, to ensure that he received the proper treatment. But Filderman also noted that the most recent documentation in the record, the 6-14-10 letter authored by Linder, "does not mention how the claimant was tolerating CPAP or whether any further evaluation of oxygen levels or residual daytime sleepiness has been done.  No further records regarding sleep issues are available for review."  (Id. at 401.)

Filderman could not speak with Linder about McCann's condition
because Linder had retired from practice.  Filderman thus spoke
with Lombardi, who indicated that he saw McCann only once, and had
no knowledge of McCann's sleep issues or conditions, except to note
that McCann used a CPAP unit.  Filderman shared this information
with Bachman.

Bachman, like Filderman, based his review exclusively on
records provided by Hartford.  His task, as he stated in the
report, was: (1) "to define [McCann's] functional limitations for
full time consistent work for the period 2/5/10 onward and at what
level[, i.e.,] heavy/medium/light/sedentary"; and (2) "to show the
specific restrictions/limitations and address limitations[ & ]
restrictions from high levels of stress associated with [McCann's]
occupation." (Id. at 388.)

Bachman recognized that McCann worked as an Interventional
Radiologist.  (Id. at 392 ("The claimant's position/title was
Interventional Radiologist[.]").)  Bachman reported that McCann:

> spent 20 hours each week performing biopsies, drainages,
> angiograms, angioplasties, stent placements, and other
> invasive procedures, which were done in a standing
> position wearing a lead apron.  He also . . . spent 28
> hours a week doing diagnostic radiology, which included
> interpreting x-rays, CAT scans, MRIs, ultrasounds, in a
> sitting position in front of a view box or computer
> monitor.  He also . . . performed fluoroscopy one hour
> each week in a standing position wearing a lead apron.
> He also . . . spent 10 hours each week doing night and
> weekend call[,] reading CAT scans and ultrasounds, and

21

> other activities, as described above, during the day
> from a computer monitor at night.  He also [completed]
> administrative work totally [sic] 1-2 hours mostly on
> the computer each week.

(Id. at 392.)  Bachman recognized Long's recitation of McCann's

typical, daily workplace activities.  He also recognized that

Kramer, through the PCE, placed little or no limitation on McCann's

daily activities.

     Bachman detailed the records that he reviewed, which included

each of the medical records, reports, and letters discussed above.

He then detailed his attempts to reach each of McCann's attending

physicians.  Lombardi, with respect to McCann's disability status

and related functional limitations, "deferred fully" to Coselli.

(Id. at 398.)  Bachman attempted to reach Coselli three times, and

left messages each time, but Coselli did not return those messages.

Bachman also called Madala, who would not accept his call.  Bachman

reported that a representative from her office instead stated that

Madala "chose not to discuss the case" because she "had only seen

the claimant once, and did not feel capable of rendering an opinion

regarding the claimant's restrictions and limitations".  (Id.)

     Bachman, after reviewing McCann's medical records and job

description, and speaking -- to the extent possible -- with

McCann's treating physicians, concurred with the treating

physicians who opined that McCann suffered from hypertension, which

could place him at higher risk of aneurysm progression.  He also

concurred that McCann could "slow the progression of his aortic
aneurysm" by "manag[ing] his blood pressure in a better manner"
through "tight blood pressure control, diet, and lifestyle
changes".  (Id.)  But Bachman, with respect to occupational stress,
stated that:

> guidelines for management of aortic aneurysms do not
> suggest that avoiding work or any occupation will cause
> slower progression of an aortic aneurysm, nor do they
> recommend cessation of work in order to slow aneurysm
> progression.  There is no data that I am aware of that
> suggests that increased emotional stress from an
> occupation or day-to-day living increases one's risk of
> progression of an aortic aneurysm.  I do not feel that
> there are any specific restrictions and limitations,
> though I agree that lifting weights heavy enough to
> cause a Valsalva maneuver is not recommended for anyone
> of the claimant's age, regardless of whether they do or
> do not have an ascending aortic aneurysm.  There are no
> limitations or restrictions from high levels of stress
> associated with the occupation, as there are no ways to
> measure this, and stress is a subjective rather an
> objective finding.

(Id. at 398-99.)  He thus concluded that McCann was "able to
perform full-time consistent work for eight hours a day, 40 hours
per week, for the period 2/5/10 onward, at a light level as per the
Department of Labor specifications."  (Id. at 398.)

**J.   Hartford's Decision on Appeal**

Hartford upheld the initial decision to terminate McCann's LTD
benefit payments on appeal, and notified McCann of the decision by
letter on October 22, 2010 ("Final Decision").  Hartford stated in

the Final Decision that it had reviewed and considered the post-termination materials prepared by Madala and Linder, the reports from Filderman and Bachman, and the materials originally entered in the administrative record.

Hartford noted in the Final Decision that Bachman found no indication or data supporting Coselli's contention that avoiding work would cause slower progression of McCann's aneurysm.  It also noted that his sleep apnea appeared, per Filderman's report, to be successfully treated.  It also stated that:

> It has been noted that Dr. McCann's occupation was that of an Interventional Radiologist and to supplement his interventional work he also did general/diagnostic radiology.  It was also noted that the occupation of Interventional Radiologist included performing angiography, angioplasty, embolization, gastrostomy tubes, stent placement, etc. The Dictionary of Occupational Titles (DOT) notes that the occupation of Radiologist is considered a light level occupation.  The DOT also has described the occupations of surgeons and physicians as light level occupations.
> Based on review of available documentation in the claim file and independent physician reviews, it appears that Dr. McCann is functionally capable of performing the duties of his own light occupation.

(Id. at 414.)

The Final Decision concluded by informing McCann of his right to commence an action under Section 502(a) of ERISA.  This action followed.

### III. STANDARD OF REVIEW

**A.    Motions for Summary Judgment**

The Court applies a well-settled standard of review to motions for summary judgment. See Fed.R.Civ.P. 56(a); Young v. Am. Int'l Life Assurance Co. of N.Y., 357 Fed.Appx. 464, 468 (3d Cir. 2009); Nichols v. Verizon Commc'ns, Inc., 78 Fed.Appx. 209, 211 (3d Cir. 2003). Because both McCann and Hartford rely on the administrative record, they present a dispute that is ripe for summary judgment.

**B.    Claims for Relief Under Section 502(a) of ERISA**

McCann, as the plaintiff in an action commenced pursuant to Section 502(a) of ERISA, bears the burden of proving both that he is entitled to benefits, and that Hartford's decision to terminate his benefits was arbitrary and capricious. See, e.g., Connor v. Sedgwick Claims Mgmt. Servs., Inc., 796 F.Supp.2d 568, 580 (D.N.J. 2011). In this context, the Court "'sits more as an appellate tribunal than as a trial court.'" Gibson v. Hartford Life & Accident Ins. Co., No. 06-3814, 2007 WL 1892486, at *5 (E.D. Pa. June 29, 2007) (quoting Leahy v. Raytheon Co., 315 F.3d 11, 17–18 (1st Cir. 2002)). Because Hartford enjoyed discretionary authority to determine McCann's eligibility for benefits, the Court must review the administrative record and determine, on the basis of that record, whether Hartford's decision was arbitrary or capricious. See Miller v. Am. Airlines, Inc., 632 F.3d 837, 844–45

(3d Cir. 2011) ("We review a challenge by a participant to a termination of benefits under ERISA § 502(a)(1)(B) under an arbitrary and capricious standard where, as here, the plan grants the administrator discretionary authority to determine eligibility for benefits."); see also Firestone Tire & Rubber v. Bruch, 489 U.S. 101, 115 (1989); Fleisher v. Standard Ins. Co., 679 F.3d 116, 120 (3d Cir. 2012). An administrator's decision to terminate ERISA-governed benefits is arbitrary and capricious only if the administrative record demonstrates that the decision was without reason, unsupported by substantial evidence, or erroneous as a matter of law. See Fleisher, 679 F.3d at 121; Miller, 632 F.3d at 845; Nichols, 78 Fed.Appx. at 211.[13]

Because Hartford enjoyed discretion to determine McCann's eligibility for benefits, it also enjoyed discretionary authority to resolve any factual disputes relating to his eligibility. See Fleisher, 679 F.3d at 122; Nichols, 78 Fed.Appx. at 211-12. The Court's scope of review is, accordingly, quite narrow. See Doroshow v. Hartford Life & Acc. Ins. Co., 574 F.3d 230, 234 (3d Cir. 2009). The Court may not now substitute its judgment for that

---

[13] "In the ERISA context, the arbitrary and capricious and abuse of discretion standards are essentially identical." Miller, 632 F.3d at 845 n.2 (citing Howley v. Mellon Fin. Corp., 625 F.3d 788, 793 n.6 (3d Cir. 2010)). "Under either articulation of the applicable standard, the question for the Court is whether the plan administrator's interpretation of the ERISA plan is reasonable." Green v. Equifax Info., LLC, No. 10-244, 2011 WL 4594226 (D.N.J. Sept. 30, 2011).

of the plan administrator.   See, e.g., id.   Instead, the Court must

"defer to [the] administrator's findings of facts when they are

supported by 'substantial evidence', which [is] 'defined as such

relevant evidence as a reasonable mind might accept as adequate to

support a conclusion.'"   Fleisher, 679 F.3d at 121 (citation

omitted); see also Nichols, 78 Fed.Appx. at 211.

The Court's conclusions under the arbitrary and capricious

standard rest on the evaluation of several case-specific factors.

See Metro. Life Ins. Co. v. Glenn, 554 U.S. 105 (2008); Miller,

632 F.3d at 855-56; Loomis v. Life Ins. Co. of N. Am., No. 09-3616,

2011 WL 2473727, at *3 (E.D. Pa. June 21, 2011).   Here, the factors

brought to the Court's attention include Hartford's: (1) reversal

of position, insofar as it began issuing and later terminated

McCann's LTD benefit payments; (2) consideration of all relevant

diagnoses; (3) consideration of McCann's ability to perform the

Essential Duties of his Occupation; (4) consideration of post-

appeal medical evaluations; and (5) role as a plan administrator

that both funds and evaluates claims.   See Miller, 632 F.3d at 845-

48, 853-56 (reviewing case-specific factors); Doroshow, 574 F.3d at

233-34 (same).   (See generally dkt. entry no. 43-1, McCann Br. in

Supp. at 17-30 (setting forth bases of McCann's arguments).)

## IV.   DISCUSSION

Hartford argues that the Final Decision is supported by substantial evidence that demonstrates that McCann is not currently Disabled and may perform the Essential Duties of his Occupation. McCann disagrees, and argues that Hartford's decision to terminate his LTD benefit payments was arbitrary and capricious.  To support this general argument, he raises five alleged points of error. (See id.)  We will consider each argument in turn.

### A.   Hartford's Decision is Supported by Substantial Evidence

The Court has thoroughly reviewed the administrative record and considered it in its entirety.  The Court now concludes that the Final Decision is supported by substantial evidence, because a reasonable person could accept that evidence as adequate to support the conclusion that McCann is not Disabled.  See Fleisher, 679 F.3d at 121 (citation omitted); see also Nichols, 78 Fed.Appx. at 211.

McCann argues that Hartford misinterprets the term Disability, because, pursuant to the reasoning espoused in the Final Decision, "an aortic aneurysm can only become a disabling condition if in fact it has ruptured, likely resulting in the individual's death." (Dkt. entry no. 44, McCann Opp'n Br. at 11.)  The Court disagrees. Hartford terminated McCann's LTD benefit payments at least in part because McCann failed to provide objective evidence of workplace

stress, and the effect of workplace stress on his aneurysm.[14]   And
in the absence of such evidence, a reasonable person might accept
the evidence in the administrative record when concluding that
McCann is not Disabled, and can perform the Essential Duties of his
Occupation.   Cf. Leipzig v. AIG Life Ins. Co., 362 F.3d 406, 409
(7th Cir. 2004).   "Many persons with serious heart conditions work
at stressful jobs for years without ill effects.   Think of
President Eisenhower, Vice President Cheney, and Associate Justice
Stevens."   Id.   Further, "[t]he insurer's decision prevails if it
has rational support in the record – and, given the views of Drs.
[Kramer, Filderman, and Bachman], that standard is met, and to
spare."   Id.; see also Fleisher, 679 F.3d at 122 (noting that broad
grant of discretionary authority, such as that here enjoyed by
Hartford, includes the authority to "interpret the plan and make
findings of fact necessary to determine eligibility").

**B.   Hartford's Reversal of Position**

McCann contends that Hartford nonetheless acted in an
arbitrary and capricious manner because, after initially finding
that McCann was "Disabled" under the Policy on June 27, 2008,
Hartford found that McCann, as of February 4, 2010, was not
Disabled under the Policy.   He argues that Hartford's reversal of

---

[14] Such reliance, as demonstrated in Section IV.D.4 of this
Memorandum Opinion, was proper.

position was arbitrary and capricious because Hartford, in reaching
the later determination, relied on improper evidence in the
administrative record.  (See id. at 17-20).  Specifically, he
argues that Hartford inappropriately relied on: (1) the comments
made by "Jodi" that indicated Coselli's alleged belief that McCann
could return to work; and (2) the IME report, which was crafted
without consideration of the 8-9-09 CT scan and report.  The Court
has considered these arguments and Hartford's opposition thereto
(see generally dkt. entry no. 45, Hartford Opp'n Br. at 2-7), and
now, for the reasons that follow, conclude that Hartford's reversal
of position was not arbitrary and capricious.

"An administrator's reversal of its decision to award a
claimant benefits without receiving any new medical information to
support this change in position is an irregularity" that weighs in
favor of finding an abuse of discretion.  Miller, 632 F.3d at 848;
see also Laslavic v. Principal Life Ins. Co., No. 11-684, 2013 WL
254450, at *11 (W.D. Pa. Jan. 23, 2013); Connor, 796 F.Supp.2d at
586 (noting that administrator's "inconsistent treatment" of facts
should be viewed with "suspicion").  That is not to say that a plan
administrator cannot, under any circumstances, terminate benefit
payments.  See Miller, 632 F.3d at 849 (recognizing that the
"initial payment of . . . benefits does not operate as an estoppel
such that [a plan administrator] can never terminate benefits");

Connor, 796 F.Supp.2d at 586.  But a plan administrator must base a decision to terminate benefit payments on some form of new evidence.  See Connor, 796 F.Supp.2d at 586; Hoch v. Hartford Life & Accident Ins. Co., No. 08-4805, 2009 WL 1162823, at *17 (E.D. Pa. Apr. 29, 2009).

The Court, when determining whether a plan administrator improperly terminated benefits, thus "focus[es] on the events that occurred between the conclusion that benefits were owing and the decision to terminate them." McOsker v. Paul Revere Life Ins. Co., 279 F.3d 586, 590 (8th Cir. 2002).  The Court must examine the administrative record to determine what, if any, new evidence was considered by the plan administrator.  See, e.g., Miller, 632 F.3d at 849; McOsker, 279 F.3d at 590.

The Court has thoroughly reviewed the administrative record and, insofar as it concerns the instant arguments, focused on the events occurring between June 27, 2008 (when Hartford "conclu[ded] that benefits were owing") and February 4, 2010 (when Hartford terminated those benefits").  See McOsker, 279 F.3d at 590.  The administrative record demonstrates that a Hartford claim representative documented a conversation with "Jodi", an otherwise unidentified representative from Coselli's office, on April 22, 2009.  "Jodi" indicated that Coselli was hesitant to complete an Attending Physician Statement, as (1) he had not treated or

31

examined McCann in the preceding fifteen months and (2) he had no knowledge of McCann's functional capabilities.  (See A.R. at 32.)

The administrative record also demonstrates that Coselli nonetheless completed an Attending Physician Statement and submitted it to Hartford on April 23, 2009 -- the next day.  (See id. at 567.)  In that Attending Physician Statement, Coselli stated outright that McCann "should be referred for functional testing".  (Id.)  Hartford thereafter referred McCann to Kramer for the IME.

The Court acknowledges that Hartford referenced the comments made by "Jodi" in the Termination Letter.  (See id. at 474.)  But neither the Termination Letter nor the administrative record, in a more general sense, indicate that Hartford in any way relied on those comments when terminating McCann's LTD benefit payments.  It instead appears that Hartford properly relied on new evidence: the IME report generated after Kramer examined McCann and reviewed the medical records provided by Hartford.  (See id. at 474, 483-85.)  It also appears that the comments made by "Jodi" were not the sine qua non of the decision to terminate McCann's LTD benefit payments; even if "Jodi" had not made those comments, Coselli's statements in the Attending Physician Statement would have prompted Hartford to schedule the IME and, eventually, to terminate McCann's LTD benefit payments.

32

The Court has also thoroughly reviewed the record, insofar as it concerns the IME report and the records that Kramer reviewed and relied on when crafting that report.  McCann argues that Hartford's reversal of position was arbitrary and capricious because Hartford relied on the IME report, which was crafted without consideration of the 8-9-09 CT scan and report.  The Court acknowledges that the IME report was crafted without consideration of those materials, but concludes that this, standing alone, does not render Hartford's decision arbitrary and capricious.  (See generally id. at 482-84.) The films and reports that Kramer reviewed demonstrate that McCann's aneurysm grew, over a period of years, from 3.71 to 4.4 centimeters.  (See id. at 483.)  The 8-9-09 CT scan demonstrates that the aneurysm measured 4.3 centimeters.  (See Hartford SOF at ¶ 47; McCann Response to Hartford SOF at ¶ 47.)  Because the 8-9-09 measurement falls within the range considered by Kramer when crafting the IME report, any error associated with Hartford's failure to provide the 8-9-09 CT scan and report was merely harmless error.[15]

---

[15] Kramer concluded that McCann's condition, which, as he understood it, included a mildly dilated aortic aneurysm measuring 4.5 centimeters, would not prevent McCann from working.  Common sense dictates that Kramer would have reached the same conclusion had he known that the aneurysm was, in fact, roughly 4.4% smaller.

**C.   Hartford's Consideration of Both the Relevant Diagnoses and McCann's Ability to Perform the Essential Duties of His Occupation**

McCann contends that Hartford's decision to terminate his LTD benefit payments was arbitrary and capricious because Hartford failed to consider sleep apnea as part of his Disability.  He also contends that the termination of his LTD benefit payments was arbitrary and capricious because Hartford considered his ability to perform the Essential Duties of a Radiologist rather than those of an Interventional Radiologist.  He supports his contentions both by reference to the Termination Letter and the events that precede it. (See McCann Br. in Supp. at 21-25.)

McCann's arguments are misplaced.  This action calls for the Court to review Hartford's final, post-appeal decision, not the initial decision to terminate McCann's LTD benefit payments.  See Funk v. CIGNA Grp. Ins., 648 F.3d 182, 191 n.11 (3d Cir. 2011).  As explained by the Third Circuit Court of Appeals:

> A plan administrator's final, post-appeal decision should be the focus of review.  See, e.g., 29 C.F.R. § 2560.503-1(h) (requiring that claimants subject to adverse benefit determinations be provided with a "reasonable opportunity" to appeal that adverse decision); 29 C.F.R. § 2560.503-1(h)(2)(i)-(ii) (requiring that claimant be provided appropriate notice and an opportunity to submit documentation and evidence supporting his or her claim); 29 C.F.R. § 2560.503-1(h)(2)(iv) & (3)(ii) (requiring that the plan administrator's review must "take[ ] into account all [additional information] . . . without regard to whether such information was submitted or considered in the

initial benefit determination," "not afford deference to
the initial adverse benefit determination," and be
"conducted by an appropriate named fiduciary of the plan
who is neither the individual who made the adverse
benefit determination that is the subject of the appeal,
nor the subordinate of such individual"). To focus
elsewhere would be inconsistent with ERISA's exhaustion
requirement. See LaRue v. DeWolff, Boberg & Assocs.,
Inc., 552 U.S. 248, 258-259, 128 S.Ct. 1020, 169 L.Ed.2d
847 (2008) (noting that claimants must "exhaust the
administrative remedies mandated by ERISA § 503, 29
U.S.C. § 1133, before filing suit under §
502(a)(1)(B)"); Metropolitan Life Ins. Co. v. Price, 501
F.3d 271, 280 (3d Cir. 2007) (similar).

A court may of course consider a plan
administrator's pre-final decisions as evidence of the
decision-making process that yielded the final decision,
and it may be that questionable aspects of or
inconsistencies among those pre-final decisions will
prove significant in determining whether a plan
administrator abused its discretion. In those
instances, however, the pre-final decisions ought merely
to inform a court's review of the final decision.

Id. (some citations omitted). Here, the Final Decision

demonstrates that Hartford properly took McCann's sleep apnea into

account and, further, considered his functional capabilities

insofar as they might impact the Essential Duties of his stated

Occupation, interventional radiology. (See A.R. at 409, 411,

413-14.)[16]

---

[16] The Court notes that both McCann and Holzer informed
Hartford in the Application that McCann served Holzer as a
"Radiologist" rather than as an "Interventional Radiologist".
(See A.R. at 785, 787.) Nevertheless, it appears that Hartford
considered all of McCann's duties, including those relating to
interventional radiology.

McCann correctly notes that "questionable aspects . . . of pre-final decisions" may be relevant, insofar as they may demonstrate that the termination of benefit payments "was not product of a reasoned, disinterested fiduciary." (See dkt. entry no. 48, McCann Reply Br. at 4 (quoting Funk, 648 F.3d at 191 n.11; Miller, 632 F.3d at 856).) But McCann fails to acknowledge that an insured's status as a "reasoned, disinterested fiduciary" does not render it infallible. Here, it appears that Hartford erred by failing to initially consider either McCann's sleep apnea or the Essential Duties of his stated Occupation, that McCann noted those errors in an administrative appeal, and that Hartford addressed and corrected those errors in the Final Decision. (See generally A.R. at 169-201, 408-15, 472-78.) It was proper for Hartford to take such corrective action. The Final Decision is not, despite McCann's protestations, rendered arbitrary and capricious merely because that action did not yield a decision in his favor.

**D. Hartford's Consideration of the Post-Termination Reports Prepared by Filderman and Bachman**

McCann raises four arguments against Hartford's consideration of the reports prepared by Filderman and Bachman, and contends that each argument provides a separate basis for concluding that Hartford's termination of McCann's LTD benefit payments was arbitrary and capricious. (See McCann Br. in Supp. at 26-30.) Specifically, he argues that Hartford improperly relied on those

36

reports because: (1) neither Filderman nor Bachman personally examined McCann; (2) neither report constituted new evidence; and (3) McCann did not have an opportunity to address those reports during the administrative review process.  (See id. at 26-29.)  He also argues that Hartford improperly imposed a new requirement -- the burden of providing objective medical evidence of the impact of workplace stress on his alleged Disability -- that was not expressed in the Policy.  (See id. at 29.)

1.   It is Irrelevant that Neither Filderman Nor Bachman Examined
     McCann

McCann first argues that Hartford improperly relied on the reports generated by Filderman and Bachman because neither of those physicians personally examined McCann.  The Court has concluded, however, that this argument lacks merit.  Both the Third Circuit Court of Appeals and district courts therein have concluded that a plan administrator that enjoys discretionary authority to determine eligibility for benefits may (1) rely on the opinions of non-treating physicians and, (2) accord those opinions greater weight than the opinions of treating physicians.  See Nichols, 78 Fed.Appx. at 211-12 ("[A]dministrators of ERISA plans are not obligated to accord special deference to the opinion of a claimant's treating physician.  [An administrator] is therefore justified in placing reliance on the opinions of its own consulting doctors and need not provide a special explanation of its decision

37

to do so."); <u>Hoch</u>, 2009 WL 1162823, at *14; <u>Forchic v. Lippincott,</u>
<u>Jacobs & Gruder</u>, No. 98-5423, 1999 U.S. Dist. LEXIS 21419, at *44
(D.N.J. Nov. 29, 1999) ("[I]t is not improper to rely on the
opinions of nonexamining physicians who had before them the entire
record of medical evidence, more evidence than was available to any
one doctor who saw plaintiff previously. . . .  That these doctors
worked for defendant might cause this Court to give their opinions
less weight, but defendant was entitled to rely upon them."),
<u>aff'd</u>, 262 F.3d 403 (3d Cir. 2001).

2.   <u>It is Irrelevant That Neither Report Constituted New Evidence</u>

     McCann next argues that Hartford erred by relying on the
reports generated by Filderman and Bachman because neither report
constituted new evidence.  This argument rests exclusively on
<u>Connor v. Sedgwick</u>, <u>supra</u>.  The <u>Connor</u> court reversed a plan
administrator's termination of benefits after determining, <u>inter</u>
<u>alia</u>, that the initial termination of such benefits did not rest on
new evidence, i.e., evidence that arose "between the conclusion
that benefits were owing . . . and the decision to terminate them."
796 F.Supp.2d at 586 (quoting <u>McOsker</u>, 279 F.3d at 590).

     It appears that other portions of this Memorandum Opinion have
rendered the instant argument moot.  The Court earlier determined
that Hartford properly relied on new evidence -- i.e., the IME
report and the PCE -- when terminating McCann's LTD benefit

payments.  Accordingly, even if the Court reached the merits of this argument and ultimately concluded that McCann was correct, the Court would necessarily conclude that Hartford nonetheless terminated McCann's LTD benefit payments only after crediting evidence that arose between the initial grant of such payments and the issuance of the Final Decision.

3.  McCann Did Not Have a Right to Review, Rebut, or Otherwise Address the Reports Before Resolving the Administrative Appeal

McCann also argues that Hartford denied him a full and fair administrative appeal because it relied on the reports generated by Filderman and Bachman before disclosing those reports to McCann. McCann argues that he should have had an opportunity to review, rebut, or otherwise address those reports before Hartford resolved the administrative appeal.

The Court has carefully and thoroughly reviewed the reports generated by Filderman and Bachman, and now finds as a matter of fact that both reports merely: (1) analyzed evidence already known to McCann; and (2) contained no new factual information or novel diagnoses.  The Court accordingly concludes as a matter of law that McCann did not have the right to review, rebut, or otherwise respond to those reports prior to the resolution of the administrative appeal.  See Shedrick v. Marriott Int'l, Inc., No. 12-30299, 2012 WL 6199987, at *7 (5th Cir. Dec. 12, 2012); Pettaway v. Teachers Inc. & Annuity Ass'n of Am., 644 F.3d 427, 436 (D.C.

Cir. 2011); <u>Midgett v. Wash. Grp. Int'l Long Term Disability Plan</u>, 561 F.3d 887, 895 (8th Cir. 2009); <u>Metzger v. Unum Life Ins. Co.</u>, 476 F.3d 1161, 1166-67 (10th Cir.  2007) ("Permitting a claimant to receive and rebut medical opinion reports generated in the course of an administrative appeal - even when those reports contain no new factual information and deny benefits on the same basis as the initial decision - would set up an unnecessary cycle of submission, review, re-submission, and re-review.  This would undoubtedly prolong the appeal process[.]"); <u>Tyson v. Pitney Bowes Long-Term Disability Plan</u>, No. 07-3105, 2009 WL 2488161, at *4 (D.N.J. Aug. 11, 2009) ("A plan administrator is not obligated to provide a claimant with access to review[ appeal]-level medical reports prior to a final decision provided that the reports only analyze evidence that was already known to the claimant and contain no new factual information or novel diagnoses."); <u>Kao v. Aetna Life Ins. Co.</u>, 647 F.Supp.2d 397, 417-19 (D.N.J. 2009) ("[T]he text of the governing regulatory provisions-and the policies underlying those provisions-do not contemplate that a claimant will be afforded the opportunity to review and rebut physicians' reports developed during an administrative appeal.").[17]

_____

[17] The <u>Kao</u> court distinguished this line of cases from the decision in <u>Grossmuller v. Int'l Union, United Auto. Aerospace & Agric. Implement Workers of Am., UAW, Local 813</u>, 715 F.2d 853 (3d Cir. 1983).  <u>See</u> 647 F.Supp.2d at 419 n.31.  The Court finds the <u>Kao</u> court's reasoning persuasive, and adopts and applies it here.

4.   Hartford Did Not Improperly Impose Requirements Beyond Those
     Imposed By the Plan

     McCann argues that Hartford denied him a full and fair

administrative appeal when it relied on the report generated by

Bachman, insofar as that report noted the lack of objective

evidence of the effect of stress on McCann's condition.  The Court

disagrees.  "Because a reasonable person could find . . . objective

evidence helpful in establishing a standard measurement of the

extent or severity of a claimant's symptoms and disability . . .

requiring such evidence was not arbitrary and capricious."  Connor,

796 F.Supp.2d 568 (quoting Kao, 647 F.Supp.2d at 413); accord

Nichols, 78 Fed.Appx. at 212 ("The record reveals that the denial

of [Plaintiff's] claim was based on any number of factors,

including the lack of objective tests demonstrating the existence

of her symptoms, something a claimant . . . might reasonably be

asked to provide." (emphasis in original)).

**E.   Hartford's Structural Conflict of Interest**

     In a situation where "a benefit plan gives discretion to an

administrator or fiduciary who is operating under a conflict of

interest, that conflict must be weighed as a 'facto[r] in

determining whether there is an abuse of discretion.'"  Firestone,

489 U.S. at 115 (internal citation omitted).  In Glenn, the Supreme

Court held that a conflict emerges where a plan administrator "both

funds the plan and evaluates the claims" because "[i]n such a

circumstance, 'every dollar provided in benefits is a dollar spent by . . . the [administrator]; and every dollar saved . . . is a dollar in [the administrator's] pocket.'"  554 U.S. at 112 (internal citation omitted).

It appears that Hartford may operate under such a conflict of interest.  See Glenn, 554 U.S. at 112; Firestone, 489 U.S. at 115. But see Fortune v. Grp. Long Term Disability Plan for Employees of KeySpan Corp., 637 F.Supp.2d 132, 144 (E.D.N.Y. 2009) (finding that Hartford "effectively 'walled-off' claims examiners from the company's finance department by ensuring that an examiner's compensation is not determined by reference to his or her record in denying claims").

## V.   CONCLUSION

The Court, as noted above, must determine the lawfulness of Hartford's decision on appeal by taking into account the several case-specific factors discussed above.  The Court gives significant weight to the conclusion that substantial evidence supports the Final Decision.  The Court also gives significant weight to the conclusions that Hartford: (1) did not act improperly by reversing position, and terminating McCann's LTD benefit payments; (2) properly considered McCann's relevant diagnoses; (3) properly considered McCann's Occupation; and (4) properly relied upon the reports generated by Filderman and Bachman.  See Miller, 632 F.3d

837 (demonstrating that such conclusions are entitled to "significant weight").  The Court does not accord any weight to Hartford's apparent conflict of interest because it appears that any such conflict had no bearing on Hartford's decision to terminate McCann's LTD benefit payments.[18]  Viewing these factors as a whole, the Court concludes that Hartford's decision to terminate McCann's LTD benefit payments was the product of reasoned decision-making and substantial evidence, and was not arbitrary and capricious.

The Court will, for good cause appearing, enter a separate Order and Judgment, granting the Hartford Motion, denying the McCann Motion, and entering judgment on Count II of the Complaint in Hartford's favor and against McCann.

                                    s/ Mary L. Cooper
                                **MARY L. COOPER**
                                United States District Judge


Date:     March 18, 2013

---

[18] The Court would, if giving any weight to the apparent conflict of interest, give it only "slight weight".  See Miller, 632 F.3d at 856.

43